LEBANON AND NASHVILLE TURNPIKE CO. *v.* J. G. CREVELING, JR., *et al.*

(*Nashville.* December Term, 1928.)

Opinion filed May 25, 1929.

150

WALTER S. FAULKNER, R. T. SMITH and R. H. CROCKETT, for plaintiff in error.

L. H. WALKER, A. A. ADAMS, SR., LILLARD THOMPSON, LOUIS CHAMBERS and ROBERTS & ROBERTS, for defendant in error.

MR. JUSTICE CHAMBLISS delivered the opinion of the Court.

This is a suit brought by the State and County to condemn for highway uses a toll turnpike, owned and being operated by a *quasi*-public corporation. The turnpike

extended from Davidson County line to Lebanon—some sixteen and three-tenths miles, three toll gates being located thereon. Appealing from the finding of a jury of view fixing, by a majority vote, the value of the road-bed, right-of-way, easements and franchise privileges at $40,000, a trial was had in the Circuit Court, where the jury reported $39,000, with interest from the filing of the petition and the contemporaneous taking of possession by the condemnors, as the amount of the damages. The Turnpike Company appealed to the Court of Appeals, where the judgment was reversed and the case remanded for a new trial. Petitions by both parties for writs of *certiorari* have been granted and the case has been argued here, voluminous and exhaustive briefs being presented.   .

Neither the right of the State and County to condemn, nor the form of the proceedings is questioned. The amount of the award alone is involved. The learned Court of, Appeals was of opinion that reversible error was committed, (1) in the improper admission of certain evidence, (2) the exclusion of the testimony offered by at least one witness, (3) in the instructions given the jury as to the measure of damages, including the refusal of certain requests.

The charter of the Turnpike Company was granted in 1835-6 for a term of ninety-nine years, expiring in May, 1935. At the time of the taking, September 19, 1925, it had nine years and eight months to run. It is a fact of great materiality that the life of the franchise was thus limited and that it was not exclusive. In 1925 by Court decree the number of toll gates had been restricted to three and in placing these gates the six miles of turnpike nearest Davidson County had been left free of gates.

■ The issues raised by the numerous assignments submitted for our consideration center about the relevancy and materiality of evidence showing (1) the existence of an independent available, public owned, "parallel" road from the Davidson County line to Lebanon, two and seven-tenths miles longer, as a competitive factor; and (2) the past and prospective net earnings of the Turnpike Company as indicated by its books.

The insistence of the Turnpike Company is that the evidence touching the first of these matters was improperly submitted to the jury, being entitled to no consideration; that, on the other hand, although net earnings is the really determinative factor, this was denied its due consideration; and that a greatly depreciated amount was awarded as the result. In this view the learned Court of Appeals appears to have concurred. We are clearly of opinion that both of these matters are elements or factors bearing upon the value of the property as of the date of its taking, proper to be considered, and that therefore the issues raised go rather to the weight of the testimony than otherwise. In this view our consideration narrows to, (1) the action of the trial judge in admitting or rejecting evidence, and (2) the instructions given or refused by him.

■ Under our Statutes and system the proceedings in condemnation contemplate a wide scope of inquiry, with flexible limitations in the fixing of a fair and reasonable value. So, as the first step, a jury of view is provided for, to go informally and without restricting instructions, upon and over the property, to inspect it, and "view" it, in all its bearings, relations and aspects, free to make all inquiries and investigations which may tend to throw light on its true present value and report what to

them seems fair and just. Then follow on appeal the more formal proceedings in the Circuit Court, but again it is a jury of twelve men chosen from the community, free from interest or prejudice, who are to have submitted to them all facts which might reasonably be expected to affect the valuation which a willing purchaser might agree upon when dealing with a willing seller. The door is opened wide to both parties to the controversy to submit all facts deemed by either pertinent to the issue, and objections going to pertinency and relevancy should be sustained only in extreme and plain cases. The jury, composed of twelve minds, should be given wide latitude, differing as they must as to details respecting controlling or influential elements of value.

And, on principle and authority, as a matter of practice and procedure, when the condemnor has established the right to take, the burden of the evidence of the value of the property taken shifts to the defendant owner. This is his right, as well as his obligation. He recovers the judgment for the value.

Condemnation proceedings are dual in nature. We have recently held that the issues of the right to condemn and of the amount of the award are so far separable as to justify separate hearings on appeal. *Nashville* v. *Dad's Accessories,* 154 Tenn., at page 198.

The rule laid down in Nichols on Eminent Domain (2nd Ed.) Vol. 2, Sec. 432, p. 1139, that ''the burden of proof is upon the owner to establish his right to recover more than nominal damages,'' finds support in *Power Company* v. *Cleage,* 5 Higgins, 417; and *Tenn. Central Ry. Co.* v. *Campbell,* 109 Tenn., 640. In *Alloway* v. *Nashville,* 88 Tenn., 510, it was held that the right of opening and closing argument remained with the petition-

er, under our State practice, although conceding the majority rule to be otherwise. But the Court recognizes that, after the establishment of the right to take, the burden of proof may shift to the other party on other questions, holding, however, that this shifting of the burden does not affect the order of the argument. It follows that if additional, clearer and more convincing evidence was not introduced with respect to those elements of value which the Turnpike Company deems of controlling importance, the omission is not chargeable to the condemnors.

█ Now the Turnpike Company's complaint of the award appears to be grounded mainly on two propositions: First, the alleged failure of the jury to give to net income due consideration, and, second, the consideration accorded by the jury under the instructions of the Court to the existence of the parallel free road. As to the first of these, if the failure was in consequence of a want of proof, the owner cannot complain. But counsel say on their brief filed February 14th, that, "The net income of the corporation for the unexpired period of its corporate life, approximately nine and three-fourths years, is definitely shown in the record," and this being so, as clearly appears, the question becomes one for the jury, of the weight accorded it, unless its consideration was improperly restricted by the trial judge.

Counsel also say that, "The Court of Appeals reached the conclusion that net income is the controlling element in determining value in a case of this character," and this appears to be the view of that learned Court, and we conceive that its reversal of the judgment below was induced chiefly by the fact that this "controlling element" was not permitted to control.

This view is predicated on the theory that the property condemned in this case was wanting in "market value," as the term is applied in condemnation cases generally, but possessed a *value peculiar to its owner,* a condition calling for the application of an exception to the general rule recognized in exceptional cases, of which *Railroad* v. *Memphis,* 126 Tenn., 267, is an illustration.

However, in that case the general rule laid down in the leading case of *Woolfolk* v. *N., C. & St. L. R. R. Co.,* 2 Swan, 427, for determining the measure of just compensation in condemnation cases, ever since followed in this State (See *Alloway* v. *Nashville,* 88 Tenn., 516; *McKinney* v. *Nashville,* 102 Tenn., 131; *R. R. Co.* v. *Hinds,* 134 Tenn., 312, and others) is approved, this general rule, being concisely stated in the recent case of *Light & Power Co.* v. *Beard,* 142 Tenn., 354, quoting from *Woolfolk* v. *Railroad Co., supra,* as follows:

"We consider the proper rule to be this, that the fair cash value of the land taken for public use, if the owner were willing to sell, and the Company desired to buy that particular quantity, at that place and in that form, would be the measure of compensation."

This is a sound statement of the rule for arriving at the "market value,"—the descriptive term commonly employed in defining the basis for condemnation awards. And here it may be well to quote a pertinent paragraph from *R. R. Co.* v. *Hinds, supra,* as follows: "The principle on which it acts is that the owner of the land shall be treated as one offering it for sale, at a fair price, while not under any stress of circumstances that would induce him to sacrifice his property, and the condemnor as an intending buyer, who is alike free from stress as not being forced to buy."

In other words, it is made clear that the forced sale basis is not the correct one. Thus is the owner protected. The condemnor has the choosing of the time when he will proceed to take the property. This may be a time most inopportune for the owner. Following a crop failure, or panic financial conditions, general or local, it happens that farm and other lands are for the time being practically unsalable. In this sense they for the time being have no "market value," if the term is to be taken to mean a present salable price. But, as already seen, as applied in condemnation cases, a willing purchaser as well as a willing seller is contemplated, even though a fiction in fact must be indulged.

It is urged that there was no demand for the property, in view of its nature and the existing conditions, and that there being no "market" for it, it cannot be said to have had a "market value," this basis for just compensation being therefore inapplicable, but that it was of a class having a value peculiar to the owner. It is insisted that this is a condition which calls for the application of the exception approved in *Railroad* v. *Memphis, supra.* Therein railroad yards were taken, valuable to the railroad defendant, but in the very nature of things not usable by, or valuable, as such, to any other railroad or other parties. It was properly held that under these conditions these yards had an element of value peculiar *to the defendant owner,* which must be recognized in the award. This case, and numerous other authorities relied on for the same proposition, are not controlling here. We find little analogy. The character of the property here involved is perhaps to some extent unusual or uncommon, but this is not the proper ground for the application of the exception. Before we may give weight

to value *peculiar to the owner,* it must appear, not that the property is peculiar, but that the *relationship of the owner thereto* is peculiar,—its advantages to him more or less exclusive. That is, that it is property having value peculiar to the owner *only,* and without possible like value to others who might acquire it; property with characteristics of location or construction which limit its usefulness, and therefore its value, to the particular own-er of it, so that these elements of value cannot pass to a third party. This was true of the railroad yards condemned by the City in *Railroad* v. *Memphis, supra,* a part of a particular railway system, the use of which could not be diverted therefrom without damage to that system, on the one hand, and having on the other hand a value to the owner impossible of transfer.

We find no such restrictive conditions here. The properties of the Turnpike Company have a value susceptible of sale and transfer to others than the present owners, unimpaired. It would be equally valuable as a revenue producer in the hands of a purchaser, and the general rule of just compensation, that is, what would it bring when sold by a willing seller to a wanting buyer, has application.

Counsel quote from the opinion of Mr. Justice LANSDEN in *Railroad* v. *Memphis, supra,* as follows: ''By fair cash value is generally meant the market value; but if the property is in actual use by the owner in such way that it possesses a peculiar value *to him,* which would be sacrificed, if placed upon the general market, he is entitled to this value, and just compensation requires that he shall be paid for it.''

This text, supported as it is by many authorities cited by learned counsel, concisely states the exception rule in-

voked and relied on for the Turnpike Company. We have italicized the two words "to him," on which the exception rests. Counsel say, "the property taken was of a peculiar character, and can hardly be said to have a market value. It was a turnpike road, and the corporate franchises of the Company owning it. There are no sales of such property with which it can be compared, and a market value, in the fair sense of that term, ascertained. One toll road may be of little value, because unproductive, and another of no greater size, length, and cost of construction and maintenance, by reason of its location may be extremely valuable." The insistence is that under these conditions the net income, past and prospective, became the dominating and controlling factor of value upon condemnation.

So, one dairy farm, or hotel property, or mill site, "may be of little value because unproductive, and another . . . extremely valuable." The test is not whether the property possesses peculiar characteristics of itself, or is of a class infrequently traded in, but whether it has elements of value peculiar to the owner exclusively. Nor do we find ourselves able to agree with learned counsel, or the Court of Appeals, that this property is of such an unusual or peculiar character as to be without market value, in the sense of being necessarily without an ascertainable sale value, as to which a purchaser may be supposed or assumed. Toll pikes have been quite common properties, bought and sold in due course of trade, as other revenue producing properties. That no two of them are identical in length, quality, extent of use, or productiveness, is not determinative. Such differences and distinctions apply quite generally. Illustrations seem hardly called for. The supposed ·pur-

chaser and seller would, of course, take these distinguishing details into consideration, together with every other element or factor bearing directly, or remotely, upon the returns which the investment might reasonably be expected to yield.

■ While we hold that net income, present or prospective, is not controlling, evidence thereof is altogether competent, the weight to be given such evidence as may be adduced being for the jury, in connection with all other material evidence.

■ A careful examination of the instructions given by the learned trial Judge satisfies us that he properly followed the well established rule announced repeatedly in this State, in accord with text book and decision authorities generally. See, among others, 20 C. J., 727-8; 10 R. C. L. 128; Tennessee cases above cited, and authorities quoted in *Alloway* v. *Nashville, supra.* We quote from the charge the following excerpts:

"For the property actually taken he is entitled to a sum equal to its fair market value on the day of the appropriation. In determining such 'fair market value' you will assume that the owner of the property on the date of the appropriation was willing to sell, but did not have to do so, and that the taker desired to purchase that particular kind and quantity of property, but, like the owner, was under no particular constraint to make the trade and transfer. That is to say, you may assume that some reasonably prudent man wanted such property as was owned by the defendant and that in his survey of available purchases came upon the property in question and that the owner of such property, although he did not have to sell, was willing to do so for a fair price and full cash payment. Then what you believe the

property would likely bring under such circumstances is the figure you are justified in putting down as your judgment of the property's 'fair market value.'

"The value of the property taken cannot be enhanced by the owner's unwillingness to sell, nor is the question to be considered the peculiar value of the property to the owner nor its value to the party condemning it. The desire of the defendant to keep and the need of the plaintiff to buy are not such considerations as should regulate your estimate of 'fair market value.'

"In determining the market cash value of property everything in proof which enhances or depreciates its worth should be taken into consideration.

"As has been said the fair market value should be computed as of the day of the actual appropriation. The value the property may have had sometime prior to the time of its taking is of use only as evidence which may point to its value at the time of the appropriation. Moreover, its physical condition, its history, its earning capacity, its future prospects, its opportunity for increasing its earning or the restriction of such opportunity, the reasonable likelihood of conditions that will tend to make it more or less valuable, are all beyond the issue unless by them the fair market value of the property on the day of the appropriation would have been effected. But on the other hand where such matters would have had effect upon the market value of the property on the day of the appropriation, then they are all proper matters for your consideration.

"Where the property of a corporation holding a franchise is being purchased, the prospective purchaser does not ordinarily limit his consideration to the value of the physical structure possessed by the corporation, but con-

siders its entire property rights including the value of the franchise under and by virtue of which they are used and employed, together often with the reputation or good will which invites patronage. The value of the franchise therefore is never to be omitted from the consideration of a jury in a suit of this nature where such franchise is shown to have a value either by direct testimony or reasonable inference.

"Sometimes the net income of corporate property is a good test of its value. The value of a turnpike road, for instance, often depends upon whether the receipts from tolls will meet the expenses and leave a margin for distribution among the stockholders.

"Therefore, in many cases it will not do to value a property of this nature at the sum it would cost to put the roadbed in place and equip the property with toll gates, for a property is not always worth what it costs to build it, but perhaps more or perhaps less than this sum. But of course where the tenure of property depends upon a condition, or where the continuation of profits is for some reason subject to the probability of radical increase or diminution, then the present profits of the business on the date of appropriation might be of less importance than other considerations in determining the property's fair market value.

"But when all this is said, it is but in explanation of the simple rule first stated; that the market value of property means that price which would likely have been arrived at on the day of the appropriation, if, instead of through the exercise of the power of eminent domain, the negotiations for the sale of the property had been carried on by a reasonable prudent prospective purchaser who wanted the property, but did not have to buy, and

a reasonably prudent owner who was willing to sell the property but did not have to. If this can be determined then you have arrived as close as may be to a fair conclusion, and you may report this sum as the market value of the property, and the amount to be named as the primary compensation therefor.''

And complying with a special request the element of ''going value'' was thus dealt with:

''I further instruct you that the term 'going value' has been used in connection with these proceedings, among the elements making up and entering into the value of the properties taken and appropriated to public uses. By 'going value' is meant that element of value, in addition to the sum of the value of its component parts, which results from the fact that the business of the Turnpike Company is in operation, and that it has an established business, i. e., a business in active and successful operation, earning a revenue.

''And I instruct and charge you that this is a proper element to be considered by you in ascertaining the value of the defendant's turnpike properties which petitioner has taken and appropriated to public uses.''

We come then to consideration of the questions raised touching the admissibility of evidence rejected or admitted. The most important of these relates to the testimony regarding the existence, in a possibly competitive form, of the parallel free road, heretofore mentioned. This calls for disposition of what we conceive to be the second of the main complaints of the Turnpike Company.

It is earnestly insisted that this evidence should not have gone to the jury. We are unable to escape the conclusion that this was a factor of much materiality. The

Court of Appeals agrees with counsel for the Turnpike Company that this matter was erroneously accorded undue consideration in the trial court, even if admissible at all. The theory is that this parallel road had been definitely and finally abandoned before the taking over of the Turnpike, and its possible use in competition, as an alternative route, was not therefore entitled to weight or consideration.

Its existence at the time of the taking and for many years previous is conceded. That the State and County had shortly before done considerable work in repairing it and putting it in condition for traffic between Nashville and Lebanon is undisputed; and while a somewhat longer route, and in other respects less desirable, and while the cost of conversion of it into an acceptable State highway would probably have been greater, it appears that it was available as an alternative route between these points at the time of the taking. This being the situation at the time of the making of the decision to acquire by condemnation the turnpike, can it be denied that a purchaser with a choice of an alternative property would have been affected in his estimate of value by this circumstance? Or that the owner would not have been likewise affected by the possibility of such a choice and resultant condition? The element of competition enters indirectly. Particularly is this true when the owner knows that the prospective purchaser is empowered and directed by law to construct over *some* route a connecting free highway link between the respective points, and that the selection of a route other than his turnpike would practically destroy its value. A prudent and reasonable owner would under these conditions necessarily consider and give weight to this fact. The state of repairs, rela-

tive length, and all other comparative conditions would, of course, enter into the issue, but the fact could not be disregarded as an element of sale value.

▮ . We understand it to be contended that by the exercise of its election in taking the turnpike the condemnors eliminated this alternative route as a factor, and thereby eliminated the existence thereof as an element of value. This assumes that the period of supposed negotiation in accordance with the rule, between a willing buyer and a willing seller, follows rather than precedes the institution of the condemnation suit and the contemporaneous taking. To this we cannot agree. It is the situation of the parties and the property before and up to the moment of the taking, and not that arising upon and following the decision, which is in effect an exercise of an option to purchase, which must be given effect.

The answer, said by learned counsel for the Turnpike Company to be "conclusive," to the facts respecting the existence of this parallel road, with its competitive possibilities, "is that as a matter of fact the State Highway Department at no time contemplated the construction and maintenance of a permanent competitive highway, connecting Lebanon and Nashville." But it must be conceded that up to the moment of the taking, at least, the State Highway Department had its right of option to construct such a highway, which would necessarily be competitive, and that it had open to its choice a parallel way, subject to such disadvantages as existed, and we find no conclusive evidence of an irrevocable election prior to the final act of taking.

The learned Court of Appeals concludes that the witnesses for the State, "did not take into account the obvious fact that upon the taking of defendant's turnpike

the parallel road was abandoned as a permanent and main highway," and holds that it was error for them not to have done so. But, in our opinion, as already indicated, the test of value was not to be applied as of the time after "the taking of defendants turnpike," when "the parallel road was abandoned," but as of the period before and up to the act of taking. This is the determinative distinction touching this feature of the controversy. And for the reasons indicated we are of opinion that there was no error in submitting to the jury all of the facts touching this parallel road, leaving to the jury the determination of their weight.

The views expressed in the foregoing portions of this opinion are conclusive of the two mainly determinative issues involved, holding, first that the test applied under the general rule of fair market value was applicable to the property herein condemned; and, second, that it was competent for the jury to have submitted to it, for such consideration as it might see fit to give it, all of the facts touching the existence of the parallel road. And having found in general terms that the charge of the trial court fairly submitted these issues to the jury, it is perhaps unnecessary to go further, but in deference to the unusual exhaustiveness of the briefs of diligent and able counsel we proceed to deal specifically with the numerous assignments of error presented, although compelled by the limitations of time and space to do so briefly. The petition of the State and County assigns errors under twenty heads, to which we refer by number, as follows:

*I.* Looking to the testimony as a whole introduced by both parties we find abundant material evidence to support the verdict. The length and physical condition of

the pike, its reconstruction cost, net income, past and prospective, volume of traffic, expense of up-keep, toll rates, exclusive or competitive features, and other pertinent facts bearing on its value, were all laid before the jury, together with opinion evidence from witnesses of varying intelligence and information, who severally gave the facts on which they grounded their estimates or opinions, so that the jury might judge of the weight to be accorded their opinions.

*II. & V.* We think the trial judge took from the jury with sufficient definiteness the mention by witness Walker of the purchase price of $20,000 that he had paid for another turnpike in Wilson County. But if not, since it. was clearly shown that this turnpike was essentially different in many respects from that involved here, we are not satisfied that the admission of this detail of fact was so prejudicial as to justify reversal.

*III. & IV.* The testimony of witness Walker as to the comparative condition of the Lebanon and Sparta Turnpike was incidental to his qualification as an opinion witness and, if not strictly competent, was not so material as to have affected the verdict.

*VI.* This assignment challenges the sustaining by the Court of Appeals of an objection to the answer of witness Perry expressing an estimate of value, in answer to the following question:

"Basing your answer upon the condition of the Lebanon & Nashville Turnpike, the condition of the parallel road, the volume of traffic and all other conditions, testified to by you before this Court and jury, state what you think was a reasonable market value of the Lebanon & Nashville Turnpike, that is, for its easement and right

of way, franchise and right to collect toll, on September 19, 1925?''

Perhaps the principal ground of the objection to this question is its inclusion of the element of the parallel road, which we have heretofore discussed fully and held to be competent. Conceding that the form and matter of the question is subject to other criticism, particularly as lacking in complete comprehensiveness, we are not convinced that it was so inadequate in substance as to defeat its pertinency. In a preceding part of this opinion we have dwelt upon the broad and non-technical scope of the inquiry proper in cases of this character. As applicable to this and other objections of like nature to the testimony we quote with approval the following from Nichols on Eminent Domain, Vol. II, 2nd Ed., page 1168, Sec. 444:

''Nevertheless, it is undoubtedly the fact that in passing upon the admissibility of evidence of value more is left to the discretion of the trial court than in the determination of most other issues, so that an exception to the admission or exclusion of evidence in a land damage case will ordinarily not be sustained, except in the case of manifest error. Moreover, the modern tendency to restrict the setting aside of verdicts for errors which do not cause substantial injustice is especially noticeable in land damage cases which usually involve a protracted and expensive trial, and which as a rule are determined by the consideration of a mass of separate items of evidence so that the admission or exclusion of one bit of testimony of questionable materiality is not likely to be of vital importance, and some courts are very reluctant to set aside a verdict in cases of this character for even a manifest error in regard to evidence, when no wrong

theory of determining damages was adopted by the trial court, especially when the jury has taken a view of the premises.''

*VII* to *XI,* inclusive. These assignments deal with objections sustained to the testimony of other witnesses, and what has been said under the foregoing subdivision is applicable here. These witnesses each showed more or less familiarity with the property, some with respect to certain details to a greater extent than others. But their respective examinations advised the jury of the extent and character of the information had by each, and enabled the jury to weigh the values of the estimates given accordingly. Opinions of non-experts are generally admitted as to the value of real property, *when the witness states the facts upon which he bases his opinion.* This is the vital thing. *Wray* v. *Railroad,* 113 Tenn., 556. It is not essential that every witness expressing an opinion shall have all-inclusive information of every detail of the elements entering into the value.

*XII.* We find no reversible error in the exclusion of that part of the evidence offered through witness Puryear as to the number of motor vehicles registered in Wilson and adjoining counties extending over the period subsequent to the taking. Happenings and conditions arising after the taking over of the properties were not proper to be submitted to the jury. The value was to be fixed as of that date. Probabilities based on past experiences and present appearances were proper to be considered, but proof was inadmissible of events happening subsequently which could not be definitely foreseen at the time of the taking. A clear analogy exists in the valuing of a life estate. In a recent case, *Ithaca Trust Co.* v. *U. S.,* Adv. opinions U. S. 357, May 1st, 73

L. Ed. 357, Mr. Justice HOLMES, dealing with the taxing of a widow's life estate, refused to look to the fact of the death of the widow within a few months. Said he "The first impression is that it is absurd to resort to statistical probabilities, when you know the fact. But this is due to inaccurate thinking. . . . The value of the thing to be taxed [here to be taken] must be estimated as of the time when the act is done. . . . Like all values, as the word is used by the law, it depends largely on more or less certain prophecies of the future, and the value is no less real at the time if later the prophecy turns out false than when it comes out true. . . . Tempting as it is to correct uncertain probabilities by the now certain fact, we are of opinion that it cannot be done." The probabilities regarding the number of motor vehicles to be licensed, cannot be made certain as of the date of the fixing of the value by evidence of facts afterward appearing. But, if it should be conceded that this evidence was admissible, in the view elsewhere expressed of the relative importance of income, we are not convinced that it was so material as to have affected the result. Therefore its exclusion did not constitute reversible error.

*XIII & XIV,* relate to instructions refused by the trial judge and approved by the Court of Appeals. As heretofore said, the charge as given correctly stated the rule as to market value and we do not find that "peculiar value" to exist which is referred to in one of these requests. And we think the charge of the Court fairly laid before the jury the element of value resting on net income. Too many other elements of chance and contingency entered properly into the fixing of the fair value to admit of the practically exclusive emphasis provided

for by the second of these requests on this matter of income.

*XV* to *XX*, inclusive. The matters embraced in these assignments have been substantially disposed of in the course of the foregoing opinion and do not require further discussion.

Errors have been assigned on the petition of the Turnpike Company to the findings of the Court of Appeals under twelve heads. In some measure, what has been said is a reply to these. This is particularly true of assignment *II*, challenging the admission of witness Walker's testimony regarding his experience with other toll roads, which he had previously purchased for Wilson County. These matters went mainly to his qualification as a witness, having had dealings with properties of a like class. No. *IV* relates to "peculiar value," already discussed, and No. *V* to details of witness Perry's testimony. No. *III* refers to a detail of witness Walker's testimony regarding litigation by the Turnpike Company. This appears to have been excluded, but we do not regard it in any event as materially prejudicial. By assignment *VI* complaint is made of the refusal of the Court to permit the filing as documentary evidence of voluminous and complicated maps, drawings and calculations, used by witnesses Holt and Trowbridge in giving their testimony. The matter contained therein was all laid before the jury by the witnesses, and we think the filing of them as exhibits, or otherwise, would have added nothing of value and would perhaps have induced confusion in the minds of laymen. Moreover, much of this data went to the matter of original or reconstruction cost, which under the conditions we do not hold to have had at all a determinative bearing. *VII* and *VIII* relate to the proper test, or

basis, of just compensation under the law, a subject fully considered heretofore. In this connection, however, it may be well to enumerate some of the elements of value which the record discloses did go to the jury, and quite properly:

(1) The physical condition of the toll road at the time of the taking, its length, width, base, surface and composition, curves and grades, bridges and drainage.

(2) Charter rights and obligations, with the restrictions on tolls in force, and to be apprehended, and, too, the limit upon the life of the franchise, and its non-exclusive character.

(3) The net income, or clear earnings, those shown in the past, and those reasonably indicated for the future; not estimated alone on distributions to stockholders, but this factor deserves recognition, particularly in valuing all enterprises of this character, where the line in accounting between replacement, or improvement by permanent additions, and repairs for temporary upkeep, is necessarily uncertain, and must often be drawn arbitrarily, and may be governed by caprice or interest. And in this case future earnings were made particularly uncertain, indeed imperiled, by a menace to this privately owned way, directly arising from the firmly declared general policy and the rapidly advancing progress of a movement adopted by the State in the common interest of its people, which must shortly practically destroy the toll road system; and, further, by the possibility of the adoption, as a competitive free highway, of the parallel road, hereinbefore mentioned.

(4) The volume of traffic over this road in the past, and its prospects for the future, subject to all the other

considerations indicated, was of course to be taken into account.

All of these, and other facts and details, were laid before the jury with reasonable fullness and were submitted to their consideration by the trial judge without prejudice.

IX. The learned Court of Appeals forcibly and clearly disposes of the issue raised under this head, holding that the corporate life, and toll franchise, of this Company will expire with the ninety-nine years fixed by its charter, citing numerous authorities, including, *Lagrange & M. R. Co.* v. *Rainey*, 7 Cold., 420; *Montgomery Co.* v. *Turnpike Co.*, 120 Tenn., 76 and others. We are satisfied with this holding and reasoning.

X. We also agree with the Court of Appeals in its estimate of the relative unimportance of the cost of reproduction as bearing on the fair present value. This for reasons assigned by that Court, and others. With nine-tenths of its right of use expired, it is obvious that the cost of construction, either original or reproduction, could not be a controlling factor. While the briefs of counsel contain interesting and learned discussions of rate making cases of public service corporations, we do not find the rules there laid down controlling here. Valuations for rate making purposes necessarily rest upon reasons and principles essentially different from those applicable in cases of sale. Elements of franchise limitation, and of competition, vital here, do not enter in there. Other distinctions might be suggested, but these suffice.

By assignment *XII* the Turnpike Company brings up its motion *non obstante veredicto*. Conceding

that in a condemnation suit the position of the parties may so change as to permit of this motion from the formal defendant, the purpose of this motion is to test the pleading, and not the evidence. We recently have directly so held. *Citizens Trust Co.* v. *Service Motor Co.,* 154 Tenn., 507. Moreover, the evidence does not, in our opinion, sustain the amount of $200,000 named in the motion. Substantially the same merits are involved, that is the amount of the award, in assignment *I,* under which the refusal of the Court of Appeals to pass on the alleged gross inadequacy of the verdict is complained of. Waiving objections to the consideration of this issue here, we feel constrained to say, after exhaustive examination of this large record, including its one thousand and more pages of ably prepared briefs, that we find, as already sufficiently set forth, ample material evidence to support the finding of the jury, and no such gross inadequacy in the award as would justify interference by this Court.

Concurring with the Court of Appeals as to the matters complained of in the foregoing twelve assignments, but being constrained to differ with that learned Court in the respects hereinbefore indicated in this opinion, its decree will be reversed and the judgment of the trial court affirmed.