STATE *v.* RASCOE *et al.*

(*Nashville*, December Term, 1943.)

Opinion filed March 4, 1944.

Roy H. Beeler, Attorney-General, and John Heiskell and Ernest F. Smith, Assistant Attorneys-General, for the State.

G. S. Ridley, of Murfreesboro, for defendants in error.

Mr. Chief Justice Green delivered the opinion of the Court.

This is a suit to condemn land under sections 3109 *et seq.*, of the Code by authority of Chapter 164 of the Acts of 1941 to be leased to the Federal Government for an air base. A jury of view assessed the total damage at $6,746.27. On appeal to the circuit court a verdict for $5,700 actual damages and $12,000 incidental damages was returned and approved. This judgment was affirmed

by the Court of Appeals and the State filed a petition for *certiorari*, which was granted.

The State seeks reversal of the judgments of the lower courts on four grounds as follows:

1. Because the State was required to introduce its evidence in chief as to the value of the land taken first, although the right of the State to condemn was not questioned.

2. Because the court allowed a number of witnesses to express their opinions as to the value of the land and as to incidental damages without such witnesses having properly qualified.

3. Because the court erred in permitting proof of damages that had actually occurred at the time of the trial, the trial having occurred some months after the land was taken.

4. Because the incidental damages found were excessive in amount.

We shall consider these objections in the reverse order. The amount of land actually taken was 44.35 acres.

Mrs. Rascoe was the owner of a fine farm of 378 acres located about two and one-half or three miles from Smyrna, Tennessee. Upwards of 3,000 acres were acquired by the State in that neighborhood for use by the Government as an air base, 44.35 acres of Mrs. Rascoe's land being taken as aforesaid.

This farm had been in Mrs. Rascoe's family for more than a hundred years. On it were a two-story colonial residence, three barns, and other improvements. The land is described as fertile, well fenced, and the whole place as quite desirable property. It was located on a good graveled road, by which the school buses passed, and easily accessible from the schools, post office, and stores at Smyrna.

Proof as to the value of the land ranged from $125 an acre upward. The State does not contend that $5,700 found by the lower courts to be the value of the land taken is excessive.

█ After a careful examination of the record we reach the conclusion likewise that the incidental damages, $12,000 in amount, found by the jury, were not excessive.

The air base as laid out and constructed completely blocked the road from the Rascoe place to Smyrna. Instead of traveling three miles over a good graveled road, in order to reach Smyrna it is now necessary to travel about ten or eleven miles over roads, some of which are very bad, and some of which are not wide enough for two vehicles to pass. As the witnesses say, this farm, formerly a road-front farm, has become a backwoods farm. Not only is access to Smyrna, where the landowner trades and where the schools and churches are located, thus cut off, but Murfreesboro, Nashville, and the outside world generally have become quite inaccessible.

When the land for the air base was leveled, in order to drain the same, it was necessary to construct three sewers or drainage pipes. One of these pipes is nine feet in diameter and two of them are seven feet in diameter. The flowage from all of them empties very near the Rascoe farm, flows over a considerable portion of the remaining land, and has materially damaged some twenty acres of that land already with prospects of future damage.

The greater number of witnesses examined on the trial below placed the damage resulting to the land not taken from the two matters just mentioned at a considerably larger sum than the $12,000 allowed by the lower courts.

We are the better satisfied with the finding as to incidental damages because of one line of proof the trial

judge excluded, which we think might very well have gone to the jury. One of the runways points directly at the residence on the Rascoe place and ends only about 200 yards from that residence. Mrs. Rascoe offered to prove that airplanes taking off in the direction of her home came over the dwelling house at a very low elevation, making a tremendous noise and, as it appeared, barely missing the house. She always entertained the fear that they might not attain sufficient elevation in the short distance between the end of the runway and the house to avoid striking the latter.

The trial judge excluded this evidence on the theory that such damage was common to all those living in the neighborhood of the air base. However, it does not appear that the dwelling house of anyone else is so close to the base nor directly in line with one of the runways. Moreover, it does not appear that the land of anyone else was taken in condemnation proceedings for this air base. Other lands going into the project were acquired by purchase. We hereafter refer to the rights of those no part of whose land was taken.

The case of *Alloway* v. *Nashville,* 88 Tenn., 510, 526, 13 S. W., 123, 126, 8 L. R. A., 123, was one in which the city reservoir was built upon part of the land taken. Apprehension of the landowner of a break in the reservoir and consequent flooding of his property was held properly to be taken into consideration in assessing his damages. It was said, ''Such apprehension, so far as it depreciates the present market value of the land not taken, is an element of incidental damages, and should be considered by the jury in making up their verdict.'' So we think in the case before us apprehension on the part of the landowner of injury to the houses from the operation of airplanes in such close proximity might well have been

considered by the jury in estimating the compensation to which she was entitled.

■ We have spoken above of the sewers constructed to drain the air base and the flowage from these sewers that came on the Rascoe land. The State objects strongly to the admissibility of this evidence. The land was taken in April or May and the trial in the circuit court was not had until the following November, during which time the land for the base had been leveled and the sewers constructed. The road too was closed after the land was taken and much of the proof as to this would be incompetent, under the State's theory.

■ There is no suggestion of negligent construction in the case. It is true that the rule announced in our cases is that damages in condemnation proceedings are to be estimated as of the time of the taking, and in *Lebanon & Nashville Turnpike Co.* v. *Creveling*, 159 Tenn., 147, 169, 17 S. W. (2d), 22, 28, 65 A. L. R., 440, it is said that, "Happenings and conditions arising after the taking over of the properties were not proper to be submitted to the jury. The value was to be fixed as of that date. Probabilities based on past experiences and present appearances were proper to be considered, but proof was inadmissible of events happening subsequently which could not be definitely foreseen at the time of the taking."

In the above case, however, the Court was dealing with evidence sought to be introduced as to probabilities arising from events that occurred subsequent to the taking. The effort was to prove that automobile registration had increased in Wilson and adjacent counties and that accordingly the turnpike condemned had become of greater value at the time of the trial than it was at the time of the taking. Such proof could have furnished a basis for nothing but conjecture because no one could

tell whether a motorist confronted by three tollgates between Lebanon and Nashville would use his car or continue to ride the bus or train. The increase in registrations might not have added to the revenue of the Turnpike Company in any appreciable amount. It was not proof of facts that was excluded.

In this jurisdiction where a considerable period usually elapses between the taking of the land and the ascertainment of damages in the circuit court, we can see no real objection to the admission of proof showing damage that has accrued to the land by the actual construction of a public improvement. The matter is well discussed by the New York Court of Appeals in one of the subway cases where the trial was not had for some time after the taking and proof was admitted as to the actual damage that had resulted from the construction of the subway. The lower tribunals had limited their awards to damages apparent or foreseen at the date when title vested in the City but the Court of Appeals said:

"The rule of evidence adopted by the commissioners was erroneous. They limited the witnesses in their estimates of value to the time when it was known that the subway was an assured fact by the filing of the oaths, although the work of construction had not been commenced, and instructed them to exclude from consideration any physical damage which had actually been inflicted at the time of the trial, when the work in front of the premises in question had been substantially completed. In estimating the market value on this basis, the experts were confined to supposition and speculation, for filing a paper in a public office worked no physical change in the property, and they were not allowed to consider the realities as shown by time and experience. The test presented to them was what the market value would

probably be if an intending purchaser knew that the road was to be built. This left everything open to the mere estimate of experts, not founded on fact, but on conjecture. Certainty is better than conjecture, and the injuries actually inflicted a better guide than the opinions of experts as to the market values just before and just after the oaths of the commissioners were filed, or during the same five minutes. The value of such evidence, always a dangerous and uncertain guide, and in this case especially so, owing to the restrictions of the commissioners, is shown by the fact that experts called by the claimants estimated the amount of the depreciation of the property just after the oaths were filed at 50 per cent. of its value just before the oaths were filed, while those called by the city, apparently of equal intelligence and experience, placed it at 10 per cent." *Re Board of Rapid Transit R. Com'rs*, 197 N. Y., 81, 108, 90 N. E., 456, 465, 36 L. R. A. (N. S.), 647, 659, 18 Ann. Cas., 366.

Mr. Nichols, in his work on Eminent Domain (2 Ed.), Section 463, states the law thus:

"It frequently happens however in jurisdictions in which the requirement that compensation precede the taking is not found in the constitution, or is ignored in actual practice, that the trial occurs long after the taking and even after the public improvement in behalf of which the taking was made has been constructed and open to public use. It was formerly considered that the jury was bound to shut its eyes to everything which had actually occurred after the taking, and it was held that evidence could be admitted only as to the character of the structure that would probably be erected, its probable effect upon the remaining land or the probable cost of restoring such land to its original relative position. The modern and

more enlightened rule is that it is competent to show the mode in which the work was constructed, the actual effect of its construction and operation upon the remaining land, and the actual expense, if reasonable, incurred by the owner in adapting his land to the new situation. Such evidence is admitted, not to modify the legal effect of the taking, or to change the rule of damages, but to show more accurately the true nature of the easement taken.''

Supporting the text just quoted are collected cases from quite a number of jurisdictions and it seems to us that this modern view is the better one, although the decisions are not in harmony. See 29 C. J. S., Eminent Domain, Sec. 185, p. 1071.

■■ It is said that the construction of the air base would have closed the road had no part of Mrs. Rascoe's property been expropriated but by reason of the fact that part of her land was taken her rights are different from the rights of one who would have only been damaged by the closing of the road but none of whose land was condemned. This question is fully discussed in *Lewisburg & N. R. Co.* v. *Hinds et al.*, 134 Tenn., 293, 183 S. W., 985, L. R. A., 1916E, 420. Owners of land, no part of which has been taken for public purposes, are not entitled to compensation for damages naturally and unavoidably resulting from the careful construction and operation of the public improvement which damages are shared generally by owners whose lands lie within the range of the inconveniences necessarily attending that improvement. On the contrary, owners of land, part of which is taken for the public improvement, are entitled to such damages so accruing to the remainder of the land. In the first instance damages are assessed as for a legal injury—

as though the action were one *ex delicto*. In the second instance the owner of the land is treated as one offering it for sale at a fair price and the condemner is treated as an intending buyer, neither party being under any stress which would force the sale or the purchase. As the seller in such a transaction would take into con-sideration damage to the remainder of his land in selling part thereof, so the law in fixing his compensation bases his damage on the same consideration.

The State relies on *Lewisburg & N. R. Co.* v. *Dudley*, 161 Tenn., 546, 551, 30 S. W. (2d), 278, 280, but that case is not in point. Involved in the *Dudley Case* were two detached lots separated by a forty-foot street, one of which was acquired on the eve of condemnation. Part of one lot was taken for railroad purposes and the effort was to recover damages suffered by the remainder of the entire property. This effort failed.

In the *Dudley Case* the Court said the general rule for assessment of incidental damages was that the in-juries to the residue of the tract, part of which was taken, which would entitle the owner to compensation, are such as especially affect him and not such as are suffered by the community generally. However, the Court added this: "The rule is extended upon facts proven and which show that exceptional circumstances attend the taking and use of the land which impair the value of the re-mainder, and so, if the use of the part taken is attended by peculiar facts and circumstances, that result in special injury to the remainder of the land, the fact that such special injury is common to all property in the com-munity would not exclude consideration of the special injury as an element to be considered in assessing the incidental damages." Without doubt such special cir-

cumstances are present in the case before us as to bring the case within the extension of the rule.

The land taken was bounded on the west by the center of the road that was closed and the taking was to the center of the road. This part of the land was a sort of L or offset to the remainder of the farm and lay to the south. The north line of the land taken became part of the north line of the air base and the latter line crossed the road and became part of the south line of that portion of the farm not condemned. At the north line of the land taken or the north line of the air base the road entered and passed through the remaining portion of the Rascoe property. The land just east of the land taken was owned by another party and was acquired by purchase up to the center of the road. So not only part of this farm was taken by the State but the road itself was taken up to a line upon which the remainder of the farm abutted.

In *Illinois Central R. Co.* v. *Moriarity*, 135 Tenn., 446, 450, 186 S. W., 1053, 1054, we pointed out that abutting owners had an easement of way in a street or road in addition to the use of it in common with the people generally. And "that such easement was private property as much as if it were corporeal property; that the rights of the abutting owners might not be ignored by the municipality, but must be reasonably preserved or compensation paid for injury done them; and that, if such easement was taken away or impaired or incumbered without the consent of the landowner, there was a taking of his property for public purposes for which he was entitled to compensation." This observation was supported by many previous decisions cited.

In addition to the damage suffered by the closing of her easement of way, the proof shows other incidental

damage sustained by Mrs. Rascoe. Although the road ran through this farm, this is not a case where two detached tracts were involved. The whole property had been operated as one enterprise for years. Improvements were on both sides of the road and all the land and improvements had a common use. The improvements were extensive and adapted to the farm of the original acreage of this one. Reduction of the acreage rendered the investment in improvements excessive and the smaller farm accordingly less profitable.

The State also relies on *Newberry* v. *Hamblen County*, 157 Tenn., 491, 9 S. W. (2d), 700. The ruling in that case, however, is inapplicable here since that case involved negligent construction by the contractor after the land was taken. As we have previously noted, there is no suggestion of negligent construction in the present case or of negligent operation. So far as the record shows the air base was laid out and has been operated just as planned.

■ The State also suggests that the road was closed and the drains built after the Federal Government took over the land acquired for the air base. We do not think that this circumstance has any bearing on the State's liability, no negligence on the part of the Federal Government appearing. The State acquired the land for the air base with the intention of leasing it to the Federal Government to be used just as it has been used. The State undertook to bear the expenses of the acquisition and the incidental damages attending the acquisition are as much an obligation of the State as is the obligation to pay for the value of the land actually condemned.

■ The State complains because it was required to introduce its proof first. The contention is, since the

right to condemn was not questioned, the burden was on defendants to show the value of the land and the trial court erred in his ruling. This is a rather unusual complaint. Ordinarily to open and close is desired by litigants and most of the controversies that have arisen have been because such right was denied. We do not recall a case in which a litigant complained when he was given the right to open and close. However the practice followed is in line with that followed in *Alloway* v. *Nashville*, 88 Tenn., 510, 13 S. W. 123, 8 L. R. A., 123, and with *Lebanon & Nashville Turnpike Co.* v. *Creveling*, 159 Tenn., 147, 17 S. W. (2d), 22, 65 A. L. R., 440. We think the State sustained no hurt by reason of being required to open and close. The trial judge still, in express instructions, imposed upon the landowner the burden of proving her damages.

Another assignment of error complains because the witnesses introduced by defendant as to the value of the land taken and the incidental damages were not properly qualified.

The objections to this evidence are not to be considered under Rule 14(3) of this Court. There is no specification of the particular evidence and the brief contains no reference to the pages of the transcript in which this evidence is to be found.

Moreover, as shown in *Lebanon & Nashville Turnpike Co.* v. *Creveling*, 159 Tenn., 147, 17 S. W. (2d), 22, 65 A. L. R., 440, a very broad discretion is allowed the trial judge in the admission of evidence of this character.

We find no error in the result reached in the lower courts and the judgment of the Court of Appeals is affirmed.