**BRAZOS RIVER CONSERVATION AND RECLAMATION DIST. v. COSTELLO et al.**

No. 2324.

Court of Civil Appeals of Texas. Eastland.

Feb. 26, 1943.

Rehearing Denied March 26, 1943.

See, also, 142 S.W.2d 414.

Samuels, Foster, Brown & McGee, of Fort Worth, and T. T. Bouldin, of Mineral Wells, for appellant.

J. R. Creighton, Ritchie & Ritchie, and W. H. Penix, all of Mineral Wells, for appellees.

LESLIE, Chief Justice.

This is a condemnation suit by way of cross action under the terms of Art. 3269,

R.S. 1925, as amended, Vernon's Ann.Civ. St. art. 3269, growing out of an injunction in which the appellee E. P. Costello and others sought to enjoin the District from entering upon their respective lands,

E. P. Costello owned a tract of land in Palo Pinto County adjacent to and in the basin of Possum Kingdom Dam, embracing approximately 4,100 acres of which about 2,400 acres was sought to be condemned for the public use of the District engaged in the construction of a dam across the bed of Brazos River.

Prior to condemnation proceeding, Costello had conveyed a one-half mineral interest in a portion of his property to Argo Oil Corporation. Subject to mineral interests sold and existing mineral leases on the 4,100 acres, Costello was the owner in its entirety, mineral and surface together.

The trial was before the court and jury, and on verdict returned, judgment was rendered in favor of Costello for $94,929.67 and in favor of Argo Oil Corporation for $9,148.85.

Goble and Moore, owners of leasehold through mesne conveyances from Montgomery, were settled with and will not be further noticed.

The District's appeal is predicated on 20 points considered in the order briefed.

Point 20 is first and as follows: "The trial court committed harmful and reversible error in withdrawing the charge read and submitted to the jury, after leading counsel for appellant had argued and concluded his argument to the jury, based on said original charge, and in substituting therefor, over the protest and objections of the remaining counsel of appellant, an entirely different charge containing and embracing issues not set forth in the original charge, and issues varying in legal effect from those in the charge first submitted. The effect of such action was to vitiate the judgment rendered by the court on the verdict."

The appellant's statement under the proposition is substantially correct and in material parts as follows:

"On February 2, 1942, the court prepared his charge to the jury and submitted to counsel for appellant for objection * * * Thereupon counsel for appellant addressed objections to the charge, which objections the court overruled * * * and then, * * * read * * * the charge to the jury. When the reading of the charge was concluded, the court * * * directed Mr. George Ritchie, one of counsel for Costello, to proceed with his argument to the jury, which was done, and at the conclusion of such argument Sidney L. Samuels of Fort Worth, * * * was directed by the court to proceed with his argument, which argument * * * was made * * * and * * * based upon the (original) charge as * * * read * * * to the jury * * *.

"At the conclusion of the argument by Sidney L. Samuels, he, * * * having been called home on an important case * * * awaiting his * * * attention, left Palo Pinto for Fort Worth, which absence was excused by the Court. This concluded the argument for the day and the court * * * adjourned * * * until the following day * * *.

"On the morning of the following day the court withdrew the charge that had been read * * * to the jury on the preceding day and substituted * * * different charge, in which the issues of fact were changed and the language of submission altered * * *. When the court made such substitution and prior to the reading of such substituted charge to the jury, the remaining counsel for appellant excepted and objected to the action of the court, because the text of the new charge was different * * * and because the issues in the substituted charge were unlike those in the original charge as * * submitted the day before; and, further, because the counsel, Sidney L. Samuels, had made his argument to the jury on the preceding day on the faith of the original charge and had been governed * * * by the issues therein submitted and the instructions of the court to the jury; * *."

Notwithstanding some expressions in brief to the contrary, each charge gave the same definition respectively of "Cash Market Value" and "Actual Cash Value".

The only points of difference between the two charges or the issues therein is manifested by the words "subject to the existing mineral leases" inserted in the last and italicized by us. The same alteration was made to issues 1 to 10, both inclusive, but for illustration only issues 1, 2 and 3 will be set forth:

"In the original charge special issue No. 1 reads as follows:

"Do you find from a preponderance of the evidence that the E. P. Costello lands,

excluding the mineral interest of Respondent Argo Oil Corporation, on or about the 30th day of October, 1940, had a cash market value?

"In the substituted charge this issue was, stated:

"Do you find from a preponderance of the evidence that the E. P. Costello lands, *subject to the existing mineral leases,* and exclusive of the mineral interest of the Argo Oil Corporation, on or about the 30th day of October, 1940, had a cash market value?

"In the original charge special issue No. 2 reads:

"Do you find from a preponderance of the evidence that the mineral interest in question of Respondent Argo Oil Corporation, on or about October 30, 1940, had a cash market value?

"This issue in the substituted charge is:

"Do you find from a preponderance of the evidence that the mineral interest in question of Respondent Argo Oil Corporation, *subject to the existing mineral leases,* on or about October 30, 1940, had a cash market value?

"In the original charge special issue No. 3 reads:

"From a preponderance of the evidence what do you find was the cash market value on or about October 30, 1940, of the 2398.5 acres of land of E. P. Costello, excluding the mineral interest of Respondent Argo Oil Corporation, taken from the Petitioner District for its purposes, considered as severed land?

"In the substituted charge special issue No. 3 is stated:

"From a preponderance of the evidence, what do you find was the cash market value on or about October 30, 1940, of the 2398.5 acres of land of E. P. Costello taken by Petitioner District for its purposes, considered as severed land *subject to the existing mineral leases,* and excluding the mineral interest of Respondent Argo Oil Corporation?"

Appellant insists that the above acts and procedure by the trial court constitutes reversible error. Such contentions will be considered in the light of the record generally and the following qualification made by the trial judge of the bill of exception preserving the point:

"Presented, considered, and overruled, with the following explanation and qualification: During the trial of the above cause and after the reading of the Court's Charge to the jury on the afternoon of February 2, 1942, at about 3:30 P.M., the parties announced to the Court that there would be three attorneys on each side to argue the case and the Court allowed by agreement two hours to each side for argument. Mr. George Ritchie, one of the attorneys for Respondents opened the argument and following him, Mr. Sidney Samuels, one of the Petitioner's attorneys, addressed the jury. Thereupon, the Court adjourned for the day, and after properly admonishing the jury, instructed all parties to be in Court at 9:00 A.M. the following morning, February 3. After such recess, the Court discovered what he considered to be a faulty omission in the wording of the Special Issues read to the jury in that *there was not excluded from their consideration in arriving at the values of the property in question the existing mineral leases on the property.* This omission had been objected to by the Petitioner in its written exceptions to the charge theretofore filed but the exception was somewhat veiled, and had escaped the Court's attention. Therefore, the Court had the entire charge re-written to include such omission in the special issues, otherwise leaving the charge the same. (Italics ours).

"At 9:00 A.M. on February 3, 1942, the Court advised the parties, not in the presence of the jury, that he proposed to withdraw the charge already read to the jury (but which had been at all times in the possession of the Clerk) and to read them the amended charge. Mr. Sidney Samuels was not in Court although the case had not been concluded, and he had apparently left the county voluntarily on account of other business. Mr. Fred Arnold, one of the attorneys for Petitioner had taken the lead in the trial of the case, particularly in the examination of witnesses, and the Petitioner had not heretofore advised the Court as to any one of its attorneys being 'leading counsel'. The Court at the time of making the announcement with reference to the new charge, advised counsel for all parties and particularly Mr. Fred Arnold and Mr. T. T. Bouldin, Attorneys for Petitioner, that he would give them such reasonable time as might be required for them to prepare and file any new objections and exceptions to such charge and would give them additional time for argument if they desired and

furthermore, would give Mr. Samuels the opportunity of re-arguing the case if they would call him to come out to Palo Pinto right away. The Attorneys for the Petitioner, whom the Court knew to be very capable and well-informed on all phases of the case, did prepare and file the foregoing additional exceptions and obtained the Court's consent to consider the original objections filed as going to the new charge; but they did not request any additional time for argument and so far as the Court knows did not call Mr. Samuels and did not request the Court for additional time to have him drive out from Fort Worth to re-argue the case. Thereupon the Court called the jury into the Courtroom and announced to them that it was necessary to read the charge and he thereupon read to them the entire new charge without comment. Following the reading of the Charge, Mr. Fred Arnold and Mr. T. T. Bouldin for the Petitioner and Mr. E. B. Ritchie and Mr. J. R. Creighton for the Respondents, argued the case to the jury. No reference was made at any time before the jury to the fact that any change had been made in the charge or as to what such change was. The Testimony was clear and undisputed that all of the lands in question were under mineral leases and that such values as were pleaded thereon by the witnesses related to the value of the minerals burdened with the leases and not to the entire mineral estate. The Court, therefore, did not consider that any harm resulted to any one from the submission of the new charge but considered that such charge as was made was proper and for the purpose of meeting specific objections of the Petitioner to the form of the original charge.

"Ernest Belcher,
"Judge."

The evidence is not disputed that Costello's property was at the time in question under oil and gas leases, and that a part of his mineral in certain acreage had been sold to the Argo Oil Corporation. The special issues, and particularly issue 3, excluded from the jury, in arriving at the value of Costello's property, any consideration of the mineral interest previously sold to Argo, but did not exclude from consideration of the jury the *outstanding leasehold estates*.

Of course no legally accurate finding could be reached by the jury without due consideration and allowance for said outstanding "mineral leases." During the

night recess, the legal effect of the original issues dawned upon the Court and he sought to correct the same by withdrawing the original issues and submitting them in final form as considered by the jury in returning its answers or verdict. As corrected or modified by the inclusion of a phrase "subject to existing mineral leases" the jury considered the value of Costello's minerals as burdened with said outstanding leases. This was but giving effect to the exception urged in the outset by appellant against the original submission on the ground of "double damages."

Further, the charge as last read is not assailed in appellant's brief on matters of form or on the ground of permitting double recovery. Presumably it met that original objection.

Other considerations:

(1) The jury had never had original charge or list of issues in its custody.

(2) Trial court communicated his intentions to withdraw and rewrite the charge to attorneys out of presence of jury.

(3) The Court evidently regarded Honorable Fred T. Arnold as having taken the lead in the trial of the case and said Arnold and Honorable T. T. Bouldin (able attorneys) argued the case in the light of the rewritten charge.

(4) The trial court regarded Mr. Samuels' absence before conclusion of the trial as voluntary for purpose of attending to other business, but extended him privilege of rearguing the case if he reappeared within reasonable time.

(5) The rewritten charge was duly submitted to appellant's attorneys who were given a reasonable time to study and object to the same.

(6) Additional time for argument was offered by Court in event appellant's attorneys desired such in the light of the rewritten charge. No additional time was by them requested.

(7) The trial court further stated that the other attorneys for appellant "whom the court knew to be very capable and well informed on all phases of the case" prepared and filed additional exceptions to the rewritten charge and also obtained the Court's consent to consider the original objections filed as applying to the new charge.

(8) The rewritten charge was read without comment by the Court and that charge was prefaced by the following: "Gentlemen of the Jury: The charge heretofore

prepared by The Court and read to you, is hereby in all things withdrawn from your consideration and you will not consider it for any purpose whatever, and in lieu of said charge I give you the following: * * * "

In the light of the whole record, and the Court's explanation of the procedure under examination, we are of the opinion that no error was committed by the trial court. If the Court became conscious of having committed an error, such as that pointed out, it was the Court's duty to take immediate and cautious steps to correct the same in order that the litigants might have a legal trial and thus avoid the results of an otherwise absurd procedure.

The Court's action was warranted by the opinion in Texas State Highway Department v. Reeves, Tex.Civ.App., 161 S.W. 2d 357, writ refused.

It is obvious that the action complained of did not result in any injustice to the appellant, but operated to the advantage of the District. Further, and in effect, the action of the Court may well be considered a reasonable response to the objection on ground of "double damages" urged against the original charge by the appellant and which the trial court thought "was somewhat veiled".

To hold otherwise on point 20 would seem to hold that a litigant has a vested right in an error which the trial court still has opportunity to correct without prejudicial effect to anyone. The point is overruled.

Appellant's first and second points, briefed together, involve kindred questions of evidence.

The first complains that the trial court erred in requiring Alvin Maddox, witness for the District and head of its Land Department, to testify over its objections to appellees' questions "That prior to the suit, on behalf of the * * * District, he had offered E. P. Costello * * * $40,000.00 for the property sought to be condemned, and that the witness considered this a fair price, and further, that the witness had asked Costello, if he, Costello, would take $50,000.00 for the land and minerals."

In this point complaint is also urged against the further question: "You told Mr. Costello that you would not come back to see him any more, if he didn't take what you had offered, didn't you? Why don't you just spit it out, Mr. Maddox; you told

him that you would not come back to see him." Whereupon, appellant's attorney objected to the question and possible answer as being "wholly immaterial". No answer was then given, but appellees' attorney said: "Q. And you have not been back? A. I don't know whether I have or not."

In appellant's first point it insists that there was error "(a) because there was no challenge to the fact that efforts had been made by the District prior to the suit to purchase the property and no contention that the Brazos River District had not endeavored * * * to agree upon a price or value of the property * * *; (b) because any proposal of purchase * * * through Maddox was an effort at composition and adjustment * * *; (c) because such question was intended obviously for inflamatory purposes to prejudice the jury * * *."

The alleged vice in appellant's second point is that the trial court erred in requiring Alvin Maddox, agent and witness of the District, to answer the following question by appellees' counsel: "You told Mr. Costello you would not come back to see him any more if he didn't take your proposition; and didn't you also tell him that you would take him and Judge Ritchie to Fort Worth to Federal Court?"

The second point in substance asserts the same as the first, that said question and answer were inadmissible "(a) because the question itself was irrelevant to any issue * * * as there was no dispute * * * concerning the fact that efforts had been made prior to the suit to purchase the property * * * (b) because the effort on the part of the land agent to buy from Mr. Costello * * * was an effort at compromise * * *; (c) because the manifest purpose of the question was to excite jealousy and hatred on the part of the jury against the District * * *."

As basis for such questions, appellee in his pleadings raised issues resisting condemner's effort to take his property on the ground the District had made no bona fide effort to acquire the same by first agreeing with the owner on the price or amount of damages. Appellant did not resist that theory, except to contend, as stated in subdivision "(a)" in each point (1 and 2), namely, that "because there was no challenge to the fact that effort had been made by the District prior to the suit to purchase the property * * *", and "because * * * there was no dispute and no issue concern-

ing the fact * * *." Such contentions at that time were denied and resisted by the appellee, who also alleged that the District had acted arbitrarily or in bad faith in seeking to condemn the fee simple title to a larger amount of excess acreage in his ranch, which was not reasonably necessary for reservoir purposes; and that it was arbitrarily seeking to condemn an island of 230 acres on which Costello's home and improvements were located and which the District did not reasonably need for its purposes.

Further, appellee contends that the testimony was admissible against the only objection made, namely, that it was "immaterial."

It was also the appellee's theory that the witness Maddox was arbitrary in his negotiations with appellees, and that he was interested and biased, making unreasonable demands because of animosity growing out of the injunction proceedings theretofore instituted against the District by Costello and others.

Appellant's points 1 and 2 are preserved in the same bill of exception, and that bill was approved and accepted with the following qualifications:

"The Respondent Costello did not file any admission under Court Rule 266, and in answer alleged in detail fact relating to the course of dealings between him and the Petitioner both prior and subsequent to the institution of this proceeding, which the Court thought, if sustained by proof, would tend to show that the governing body of the District were arbitrarily and capriciously seeking to condemn the fee simple title to a large amount of excess acreage, which was probably not necessary for their reservoir purposes. Therefore, the question and answer first mentioned in the bill (Point 1) was considered at that stage of the proceeding to be admissible on the above issue, also admissible on the question of whether the District had made a good faith offer, on which question the Court considered the District had the burden of proof.

"When the first question in the bill was propounded (concerning offer of $40,000.-00), Counsel for the District objected to it on the ground that it was *immaterial* because all they were required to do was to show that an effort had been made to purchase and that no agreement could be made. Counsel for Respondent then stated to the Court that Respondent had a right to go into whether the offer was made in good faith. The Court thereupon asked counsel for the District:

"'Your objection to it is on the ground you only have to show that you could not get together on the price?' to which question counsel made no reply, and the Court then admitted the testimony on the issue of whether their effort to settle had been in good faith.

"Following the admission of all of such testimony, Petitioner's counsel and the Court had the following discussion:

"'Judge Bouldin: The whole offer is never admissible, your Honor, on an effort of compromise.

"'Court: Well, it has been testified to and no objection was made to it.

"'Judge Bouldin: Well, if it was not objected to, then we object to it now.

"'Court: You are too late.'

"No motion was made by Petitioner's counsel to withdraw the testimony from the jury."

■ The bill of exception as qualified and the statement of facts both establish that no such objections as set forth in subdivisions "b" and "c" of said points, respectively, were made to the questions or testimony under consideration.

■ When the question quoted in the appellant's first point was propounded to the witness Maddox, the objection was made that it was "wholly immaterial". In a sense the witness did not answer the question at all, but replied to a substituted question, namely, "And you have not been back?" with the following answer: "I don't know whether I have or not." If that be regarded as an answer to said question it is not believed that any prejudicial error is reflected. The objection that the question was "wholly immaterial" was but a general objection without any validity under the circumstances. Discussing that type of objection, it was held in McEwen v. Texas & P. Ry. Co., Tex.Civ. App., 92 S.W.2d 308, 309, as follows: "A general objection to evidence—meaning one which does not definitely and specifically state the grounds on which it is based so that the court may intelligently rule on it— is, as a general rule, insufficient." Many authorities are there cited dealing with like objections or those in substance and effect the same as here under consideration.

It does not appear from point 2 or the bill of exception that the witness answered or was required to answer the question assailed in point 2, and the objection, if any, was the "same" as theretofore urged in that line of testimony—possibly as "immaterial".

Further, and as stated by the trial court, at the time these questions were propounded and that testimony sought to be developed, the appellees had not made any admissions under Rule No. 266, Texas Rules of Civil Procedure and at that stage of the proceeding, when witness Maddox was on the stand, appellee was attempting to make an issue sufficient to go to the jury on the question of the District's good faith effort to agree on damages prior to condemnation, as well as its right to condemn excess acreage not needed for the District's purposes. Later in the trial certain testimony offered by Costello was rejected by the Court, and considering himself unable to make an issue on the question of good faith offer, abuse of discretion, and excess acreage, no issue was submitted, but no motion was made by either party to withdraw said testimony pertinent to such issues.

In the light of the complete record, we are of the opinion that no error was shown in the matters presented by points 1 and 2 and they are, for the reasons assigned, overruled.

Point 3 asserts the trial court erred "in requiring the witness Alvin Maddox, Land Agent of the Brazos River District, over the objection of Appellant, to testify that there was other land than the Costello land that had not been settled for by the District, such as the O'Connor and Roberts land in Stephens County, on which a suit in condemnation was pending concerning it, and that the witness could not recall what other lands there were sought to be required by the Brazos River District for its uses which had not been settled for; * * *."

This point is not clear in its import and it rests upon the third bill of exception embracing disconnected parts of a running examination of the witness which covers several pages of testimony. The point seems to charge that the testimony (a) "Concerning other lands in which Costello had no interest was remote to the issue * * *", (b) "was prejudicial and leading the mind of the jury away from the true issues in the cause and shed no light upon the question of value. * * *."

That bill of exception was approved and accepted with the qualifications:

"The court, as is shown in the Statement of Facts, pages 94 to 97, sustained in part the objections mentioned in the foregoing bill. In addition to that, other testimony was later brought out from this same witness without objection as to the date of the acquisition of the Belding, Carter, Thomas and Mike Costello tracts, and the size of those tracts as compared to the Costello property.

"The court did not admit any details as to these particular purchases but admitted only the general facts above indicated on the issue of prejudice of the District against the plaintiff in the injunction suit, and the arbitrary attitude of the District in seeking to condemn a fee simple title."

In the body of the bill it is recited, "The Court ruled that he admitted such questions and the answers thereto in order to show that there was personal prejudice of the witness, Alvin Maddox toward Costello. The Court ruled that he did not admit the witness to answer as to any deals in the other transactions, but did permit the witness to show the attitude of the witness Maddox toward Costello."

Under the circumstances and in the light of the issues made, the feeling and interest, if any, of the witness as against the appellee was proper matter for inquiry. We have carefully considered the bill of exception on which the point rests and we do not believe that it manifests error. Believing the point to be without merit, the same is overruled.

The appellant briefs points 4, 5, 6, 7, and 7a together. They will be so considered here, inasmuch as they involve kindred questions of evidence. In substance these points complain that the Court committed error in permitting witnesses for appellee (1) "to testify that the result that had ensued from the filling of the lake or reservoir was to prevent Costello from operating the leases on the Costello tract and marketing his produce" therefrom. That the Court erred in permitting said witnesses (2) "to testify to the closing up of roads and highways and the removal of bridges which led to the Costello land, growing out of the filling up of the lake or reservoir", that is, the witness Montgomery had been permitted to testify that before the lake was filled and the bridge across

the Brazos River destroyed, the most direct route from Pickwick, a trading point, to Mr. Adkisson's lease, was "3½ miles", and that thereafter to reach said point it was necessary to travel "75 miles". That it also became necessary to travel about "26 miles" in going from said lease to Graford, a nearby town or market. In substance considerable testimony was admitted (ove objections of appellant) concerning the effect which the destruction of the highway (adjacent to and leading to Costello's lands) and the necessary removal of the bridg had on property of appellees', especially that part of the same not sought to be condemned but rendered more inaccessible and less valuable for use for farming and ranching and the production and marketing of oil and gas. Particularly so in that stores, post office, schools, and churches had been rendered more inaccessible to that par of his ranch (1,700 acres) not taken or sought to be condemned in this proceeding.

Stating the contentions somewhat differently, the appellant says: "(a) The construction of the Possum Kingdom Dam and reservoir, including the bed and banks of the Brazos River, a navigable stream, being done in the proper exercise of governmental powers and not directly encroaching upon the land and property of appellee, though their consequences may impair the use of such land, is not a taking of property within the meaning of constitutional provisions which prohibit the taking of property without just compensation."

That "(b) * * * the District was authorized and empowered to build the dam * * * and to fill with water the reservoir formed by the same; and, therefore, the District in removing the bridge which constituted a part of the highway over the Brazos, doing same in the exercise of its powers vested by the state, did not commit an act of taking appellee's property or impair the use of such property which would authorize appellee to compensation therefor, nor any right of action against the District."

Its first insistence is that if any damages have accrued by virtue of the inundating of roads and flooding the bridge, etc. such damages are damnum absque injuria. Second, that the damages asserted by appellees are common to the community and citizens in that locality, and, therefore, not recoverable.

The trial court's qualification of the bill of exception upon which these points are predicated seems to go directly to the gist of the contentions. It is: "Approved with the Following Qualification: That one of the elements of damage pleaded by Respondent was the reduction in value of the lands including minerals remaining after the severance of the part condemned, because of its being cut off from accessibility to post office, markets, etc., and because of the difficulty of moving in oil well equipment, and the loss of pipeline connections; and the Court considered the testimony admissible on that element of damages."

To sustain its propositions, the appellant cites Chicago, Rock Island & G. Ry. Co. v. Tarrant County Water Control & Improvement District, 123 Tex. 432, 73 S.W.2d 55; Motl v. Boyd, 116 Tex. 82, 286 S.W. 458; Monongahela Bridge Co. v. United States, 216 U.S. 177, 30 S.Ct. 356, 54 L.Ed. 435; Union Bridge Co. v. United States, 204 U.S. 364, 27 S.Ct. 367, 51 L.Ed. 523; 20 Corp.Jur. 681, § 145; Brazos River Conservation and Reclamation District v. McGraw, 126 Tex. 506, 91 S.W.2d 665; Constitution of Texas, Art. 16, Sec. 59a, Vernon's Ann.St; act creating Brazos River Conservation and Reclamation District, Loc. & Sp.Acts 1929, 2d Called Sess., c. 13, Sec. 12, as amended by Acts 1935 c. 19, § 5, R.C.S.1925, Title 128, Chapter 8, Vernon's Ann.Civ.St. following article 8197f, Art. 7585 R.S.1925; Robbins v. Limestone County, 114 Tex. 345, 268 S.W. 915; Harris County v. Hall, Tex.Civ.App., 56 S.W.2d 943; Britton v. Smith, Tex.Civ.App., 82 S.W.2d 1065.

A brief statement of the factual background of these contentions will now be made. In answer to the District's cross action for condemnation, Costello alleged that prior to inundation of his property, he owned a well improved ranch of 4,100 acres extending about seven miles along the Brazos River; that such property was known to be in an oil producing area, and that oil was being produced from several horizons thereunder; that on different occasions he had leased said property and was receiving valuable bonuses and rentals therefrom; that said property was located just across a river bridge over the Brazos about one mile from a school, church, store, and post office, and that he had telephone connections and good roads to his premises.

He further alleged that by the taking of the land sought to be condemned, the remainder of appellee's property, consisting of about 1,700 acres (of same continuous

tract) lying on the main land west of the river, had been left in an irregular shape and cut off from accessibility to the outside except by a rough mountain road going into Stephens and Young Counties. That the nearest post office, schools, etc., were now many miles further away by available roads, and that the difference in value to the remainder of said property by reason of such features and the damage thereto was the sum of $17,000.

The Argo Oil Corporation alleged that it was the owner of an undivided one-half interest in the minerals and under a certain 367 acre tract of land on which the District sought to condemn an easement, that about 317½ acres of the tract was actually being taken or covered by water of the lake and the producing wells thereon were destroyed. That about 30 acres of the same, lying above the river, would be damaged and cut off from market and from access to roads, etc., and that same would be rendered unfit and undesirable for mineral development; that by reason of such new conditions, the value of the property would be diminished.

In response to issues 7 and 8, the jury found damage to Costello's 1,700 acres in question and not taken was $4,250, or $2.50 per acre. No issue on damages to Argo's mineral interest above the water of the reservoir was submitted to the jury.

In some of appellant's points, it seems to assume that the construction of the dam and reservoir with their natural results had not "directly encroached" upon the land and property of appellees and it proceeds upon the theory that the exercise of the power of eminent domain vested in the District by the State was not an act of "taking" of appellee's property "within the meaning of constitutional provisions" or the impairment of the use thereof entitling the appellee to damages for property taken and to the part thereof not taken. On this phase of the controversy, it will be observed that the dam and reservoir actually floods about 2,000 acres of Costello's land and left about 1,700 acres in the situation above set forth.

As we interpret the record, appellees do not contend that the District's destruction of the bridge across the Brazos and the covering of the public road by which access was obtained to the nearest center of population and outside conveniences, were in themselves separate elements of damage for which the jury should award specific sums of money; but that such evidence to which reference has been made and touching on these features merely related to depreciation in value of the remainder of the property which the District was not seeking to condemn (1,700 acres).

The rule is well established that where a part only of a tract of land is taken, the owner is entitled to be paid for the value of the part so taken plus any diminution in value of the remainder of the tract. 16 Tex.Jur. 986.

In order to enable the jury to determine the depreciation of the remainder, the parties have the right to introduce evidence of everything which would tend to affect the value of the land in the estimation of a proposed purchaser or would tend to make it more or less valuable to the present owner. 16 Tex.Jur. 991; Parker County v. Jackson, 5 Tex.Civ.App. 36, 23 S.W. 924.

Clearly the District had authority to appropriate for its use the bed and banks of the Brazos River and to build the dam in question, as well as maintain the reservoir, but the District has not been given authority to take or invade the property of private citizens without paying damages ascertained according to the law of eminent domain. That is, "Where the condemnor seeks to appropriate part of a *continuous tract,* the statute, as interpreted by the courts, requires that the owner be paid as compensation the value of the land actually taken plus any diminution in value of the residue of the tract." 16 Tex.Jur. 986, § 307.

The same rule was employed in United States v. Grizzard, 219 U.S. 180, 31 S.Ct. 162, 55 L.Ed. 165, 31 L.R.A.,N.S., 1135, a case very like the instant one, and the first paragraph of that opinion, presently quoted, points out the features which distinguish the case of Monongahela Bridge Co. v. United States, 216 U.S. 177, 30 S.Ct. 356, 54 L.Ed. 435, and that line of authorities cited by appellant from the instant one. In that case the Court in part held [219 U.S. 180, 31 S.Ct. 163, 55 L.Ed. 165, 31 L.R.A.,N.S., 1135]:

"But here there has been an actual taking by permanently flooding a part of the farm of the defendants in error. An incident of that flooding is that a public road running across the flooded land is also flooded. But if this were not so, and the roadway had simply been cut off by the interposition of the flooded portion of the farm, the damage would be the same. Since, there-

fore, there has been a taking of a part of the owners' *single tract,* and damage has resulted to the owners' *remaining interest* by reason of the relation between the taken part and that untaken, or by reason of the use of the taken land, the rule applied in the cases cited does not control this case.

"* * * The damage to the land not appropriated is the obvious consequence of the taking of a part of the whole by flooding,—a manner of appropriating which has made the village market, church, and school so inconvenient of access as to add some .3 miles of travel by an unimproved and roundabout country road. Whenever there has been an actual physical taking of a part of a distinct tract of land, the compensation to be awarded includes not only the market value of that part of the tract appropriated, but the damage, to the remainder resulting from that taking, embracing, of course, injury due to the use to which the part appropriated is to be devoted." (Italics ours).

In 10 R.C.L. p. 143, par. 135, the rule is stated:

"In other words, he (landowner) its entitled to compensation for the taking of his land, and all its consequences; and the recovery for the damage to his remaining land is not based upon the theory that damage to such land constitutes a taking of it, nor is there any requirement that the damage be special and peculiar or such as would be actionable at common law; it is enough that it is a consequence of the taking."

"* * * Damages to the remaining land that have been allowed include * * * injuries from cutting off access to the nearest highway." (Sec. 136, same text.)

Recoverable damages for such elements of injury are dealt with in Central Georgia Power Co. v. Stone, 139 Ga. 416, 77 S.E. 565, wherein it was held: "Inaccessibility to market from the balance of a farm, resulting from condemning a part of it and flooding it with water, is a legitimate subject of consideration by a witness in estimating the decreased market value of the part not taken."

It was likewise held in City of Cushing v. Buckles, 134 Okl. 206, 273 P. 346, the fact that a property owner, a part of whose land is being condemned for flooding for reservoir purposes, will have to go a much greater distance to receive his mail, may be considered by the jury in determining the depreciation of his remaining land.

Under the rule of law thus stated and in view of the fact that Costello's entire ranch was under lease for mineral development at the time of the taking of a part thereof by appellant, and that part of the property was actually producing, that farming and ranching were appropriate and customary uses thereof, that the 1,700 acres were rendered inaccessible for mineral development and other usual purposes, we are of the opinion that the testimony under attack by said points was admissible. Definite uses of the land and accessibility to it by highways, pipelines, etc., were adversely affected by the circumstances detailed and had a legitimate bearing on issues of recoverable damages.

There is no merit in the contention that appellee suffered no damages other than those common to the community. In submitting special issue 8, the Court required the jury not to consider any decrease in value by reason of injuries, if any, suffered by Mr. Costello in common with the community in general.

Further, point 7a relates to testimony of E. P. Costello, but neither assignments of error 10 and 11 nor bill of exception 8 relates to the tesimony of Mr. Costello.

This group of points is overruled.

Points 8 and 9 attack as inadmissible certain testimony given by witnesses Montgomery and Johnson and which bore on probable amount of oil recoverable from lands in question, known producing formations, and the values thereof. The testimony was directed to the question of the value of the lands and mineral interest owned by appellees and being taken or affected by the District. The testimony on that phase covers many pages. That of Montgomery alone covers about 130 pages, and that of Johnson about 60 pages.

The testimony was admitted on the theory that the witnesses had qualified as experts. Montgomery testified he was by occupation a petroleum engineer and geologist, that he attended the University of Oklahoma and had been engaged in his profession for about 25 years and was familiar with the oil producing area in which the lands in question were located. The questions disclosing qualifications were numerous and minute in detail. The same is true as to the witness Johnson, who took his degree in geology at the University of Minnesota, had been a practical geologist for more than 35 years. He had operated in Texas since 1919 and was familiar with the producing

areas and the producing sands in the Counties of Young, Jack, Palo Pinto and Stephens, as well as the properties in question. Witnesses put no stated value on lands beyond proven areas.

We have carefully studied the bill of exceptions on which these assignments are based and have read the statement of facts relating to the questions raised. In approving and clarifying bill of exception 9 (Pt. 8) the trial court made pertinent explanations and gave the theory on which the testimony was admitted as follows: "The Court admitted the testimony on the theory that the witness had qualified as an expert geologist and petroleum engineer, with knowledge of the acreage in question and also gave testimony about possible production from the territory." In signing bill of exception 12 (Pt. 9) the trial court referred for subject matter of the bill to several pages of the statement of facts, which has been duly considered.

It is our opinion the Court committed no error in admitting the evidence of said experts. They certainly qualified as such. The oil and gas flooded and covered by the waters of the reservoir partook of the nature of realty and its value is ascertainable under well recognized rules. In 32 C.J.S., Evidence, § 545, p. 295, in discussing the question of evidence relating to real property, it is stated: "The value of real property may be proved by the estimate, conclusion, or opinion of a competent witness." The footnote to this rule cites numerous authorities to the effect that value of oil and gas leases and minerals may be proved by expert witnesses. In Thorn v. Dunn, Tex.Civ.App., 94 S.W.2d 1229, 1230, the rule is recognized in Texas in a case involving the value of minerals under a certain lot. There it was held:

"The lots were located within 2,000 feet of a flowing well. Geologists testified that the oil field extended to them, and showed a shallow pool all around them, and that they were located on the oil structure, and that mineral rights or leases on that structure were valuable. * * *

"Minerals in place are matters concerning which the ordinary person probably knows little as to their value, and their value is usually a matter for expert testimony to explain to the jury, because not capable of being understood by the average person."

In Julian Petroleum Corp. v. Courtney Petroleum Co., 9 Cir., 22 F.2d 360, 362, the Court in considering the admissibility of testimony by experts in geology and oil field work, in holding such evidence admissible, said: "No doubt, as a general rule, remote, uncertain, and speculative damages are not recoverable; but the difficulty lies in the application of the rule, not in the rule itself, and it seems to be firmly established in all the oil and gas producing states that damages such as are claimed here are recoverable, and that such damages are provable by experts, or by the opinions of well-informed persons upon the subject under investigation", citing many authorities, among them 5 Texas cases.

The above opinion quotes from Wheeland v. Fredonia Gas Co., 92 Kan. 50, 139 P. 1010, the following: "The nature of the case is such that it is impossible to tell what a well will develop until it is sunk, and yet experts in oil territory are able to furnish reasonably accurate estimates of what a certain territory will produce, estimating from producing wells in the locality." See, also, Montana Ry. Co. v. Warren, 137 U.S. 348, 11 S.Ct. 96, 34 L.Ed. 681.

Said rules of law reflect the nature of testimony responsive thereto and, as we understand it, sought to be introduced on the trial below. The elements under investigation seemed to involve properties and values pertaining to lands producing, lands proven but not producing, and lands semi-proven or bearing possible values merely as leaseholds, or for leasing purposes ("mineral or royalty rights") according to nearness to production or other circumstances. Points 8 and 9 are overruled.

Points 10, 10a, 11, 12 and 13 raise questions of admissibility of testimony by Costello, the owner of the ranch, parts of which were being condemned. He was permitted to testify to uses he made of his property, income and profits derived therefrom, the average size of calf crop, amount of feed raised on different farms in the ranch, labor bills, expenses, etc., as bearing upon the question of net profits from the lands sought to be condemned by the District. The appellee introduced such testimony on the theory reflected by the rule of law stated thus in 65 A.L.R. 456 as follows: "As a general rule, the courts accede to the view that income from property in the way of rents and profits is an element of consideration in arriving at the

market value or measure of compensation to be paid for taking property in condemnation proceedings."

In support of the soundness of this rule, see City of Cushing v. Pote, 128 Okl. 303, 262 P. 1070; Weyer v. Ry. Co., 68 Wis. 180, 31 N.W. 710 (amount of crops grown and price therefor); Alabama Power Company v. Herzfeld, 216 Ala. 671, 114 So. 49; Sanitary District of Chicago v. Ry. Co., 216 Ill. 575, 75 N.E. 248.

Of the case last cited, it is said in annotations, 65 A.L.R. 459, " * * * the productivity and capacity for yielding profits to the owner were held to be a consideration in determining the value of the land."

See Lebanon & N. Turnpike Co. v. Creveling, Commissioner, 159 Tenn. 147, 17 S.W.2d 22, 65 A.L.R. 440, under which the annotations on the point are made.

In 16 Tex.Jur. p. 1032, § 349, under the subject of eminent domain and the topic of "elements and evidence of market value and loss," the rule is stated thus: "It is competent and proper to produce evidence of any fact which may reasonably affect the value of the land taken."

In advancing the above proposition, the appellant cites no authorities in support of the same, and we are of the opinion the authorities here cited and others like them adopt the above rule under such facts as are presented by this case.

The Court's qualification or explanation of bill 27 relieves points 14 and 15 of any vice. It states that the questions objected to were not answered, and that questions answered were not objected to. The record sustains the explanation. Aside from that, point 15 shows no error. The testimony there involved was material on the alleged interest and feeling, if any, of the witness Maddox, as well as on the alleged arbitrary effort of the District (through him) to take ·more of Costello's land than the District in fact needed, etc.

The 18th point manifests no error and is overruled. Apparently some questions were propounded to the witness which he did not understand, and the answers were not responsive, and when the question was restated, it seems to have been misunderstood again and the line óf questioning was abandoned.

The nineteenth point presents no error. Other witnesses gave like testimony which was admitted without objections. Further, we think the testimony was admissible on the value of the lands for farm and ranch purposes since it was given by one who knew land values for such purposes and had qualified to speak on such elements of value. 32 C.J.S., Evidence, § 545, p. 300, note 83.

For reasons assigned, the judgment of the trial court is affirmed.